IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEVIN PARKER,

                       Plaintiff,

           v.

LISA KRAUSE-HENGST, Deputy Sheriff;
TRAVIS McPHEARSON, Deputy Sheriff;
JAIME PETERSON, Deputy Sheriff;
DAVID CLINE, Deputy Sheriff;
CINDY SCHALLER, Deputy Sheriff;
JOHN BROGAN, Deputy Sheriff Sergeant;
Employees Dane County Jail, Individual
and Official Capacity,

                    Defendants.

                                    OPINION AND ORDER

                                      09-cv-436-vis

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Kevin Parker has brought this civil action for damages, contending that defendants subjected him to excessive force while removing him from his cell at the Dane County jail for a transfer to the Sturtevant Transitional Facility and that they were deliberately indifferent to the serious injuries he suffered during the removal. Defendants Lisa Krause-Hengst, Travis McPherson, Jaime Peterson, David Cline, Cindy Schaller, Colin Foster and John Brogan deny the contentions and have moved for summary judgment on

1

two grounds:  First, that plaintiff has not exhausted the administrative remedies available to him and second, that plaintiff cannot show that defendants used excessive force against him under the circumstances, that he received any serious injury or that they were deliberately indifferent to any injury he did receive.

I conclude that defendants failed to show that plaintiff had any administrative remedy available to him; therefore, he cannot be barred from proceeding on his claims by his failure to exhaust his remedies.  I conclude as well that plaintiff's suit cannot go to trial because no reasonable jury could find from the undisputed facts that defendants subjected plaintiff to excessive force and denied him medical care for a serious medical need.

In finding which of the proposed material facts are in genuine dispute, I have taken into account the facts proposed by defendants, plaintiff's response to the proposed facts and the video filed with the court by defendants.  A word about the video.  Ordinarily, in deciding a motion for summary judgment, a court is to read the proposed facts in the light most favorable to the non-moving party, reserving for the jury the task of resolving disputes.  Thus, if the moving party, such as defendants in this case, proposes as fact that when the plaintiff was asked to move, he refused, and the plaintiff proposes as fact that he complied, a jury would have to decide which one to believe.

In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court considered how courts should treat a video of the disputed facts in determining whether material facts are in

2

dispute.  In <u>Scott</u>, the video depicted a high speed chase involving Harris and Scott, a Georgia county deputy.  Harris was injured in the chase and sued, alleging that he had been subjected to an unreasonable seizure under the Fourth Amendment.  Scott moved for summary judgment, asserting that he was entitled to qualified immunity from suit.  The district court denied the motion, finding material issues of fact requiring jury determination. The court of appeals affirmed the decision.  The Supreme Court granted certiorari and reversed, finding that the lower courts had erred in viewing the facts in the light most favorable to Harris, the non-moving party.  That approach is correct, the Court said, only when there is a "genuine" dispute as to those facts.  When, as in the case before it, a videotape captures the events in question and clearly contradicts the non-moving party's version of the events, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  <u>Id.</u> at 380.  Harris's "version of the events [was] so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."  <u>Id.</u> at 380-81.

In this case, the videotape submitted by defendants contradicts many of plaintiff's allegations about the manner in which he was removed from his cell at the jail for transfer to Sturtevant.  Plaintiff has not objected to the use of the video or suggested that it was doctored or altered in any way or that it is an inaccurate depiction of the events at issue.

3

Even without the video, I would have to find that defendants were entitled to summary judgment in their favor.  None of plaintiff's objections to defendants' proposed facts are based on any evidence in the record, merely on his own unsupported assertions that the proposed fact is disputed.  For example, defendants propose as finding of fact 26 that when plaintiff did not comply with defendant Brogan's directive to lie face down on his bunk, Brogan instructed the cell extraction team to enter plaintiff's cell.  Plaintiff disputes this fact, saying, "I did comply when Sgt. Brogan instructed me to," but he cites nothing to support his statement, such as an affidavit in which he sets forth under oath his version of what happened on March 6, 2009.  I note that the magistrate judge provided plaintiff extensive instructions about how to respond to a motion for summary judgment and what he had to do to defeat one.  Pretrial Conf. Order, dkt. #13, 14-21.

## UNDISPUTED FACTS

On March 6, 2009, plaintiff Kevin Parker was an inmate at the Dane County jail, about to be moved to the Sturtevant Transitional Facility.  Defendants Lisa Krause-Hengst, Travis McPherson, Jaime Peterson, David Cline, Cindy Schaller and Colin Foster are Dane County deputies.  Defendant John Brogan is a Dane County deputy sheriff sergeant.

All of the defendants were on duty at the jail on March 6, when two conveyance officers, deputies W. Harris and C. Miller, arrived at the Male Segregation section of the jail

4

to transfer plaintiff to Sturtevant. Defendant Foster explained to plaintiff that his parole officer had decided he should be transferred to Sturtevant. Plaintiff responded that he wasn't going anywhere and that he hadn't been sentenced to prison. Foster explained that plaintiff was not going to prison but to a transitional facility and told plaintiff again that the decision had been made by his parole officer. Plaintiff's response was to repeat that he wasn't going anywhere.

Deputies Harris and Miller continued to explain the situation to plaintiff but he remained adamant about not cooperating. Deputy Foster talked to defendant Brogan, the shift supervisor, who came to Male Segregation to try to get plaintiff to cooperate in the move, but he too was unsuccessful.

Defendant Brogan obtained a taser and assembled a cell entry team, made up of defendants Krause-Hengst, McPherson, Peterson, Cline and Foster. Defendant Schaller videotaped the incident, beginning with defendant Brogan's initial attempts to get plaintiff to cooperate and ending with plaintiff's placement in the transfer van. While the team was assembling, sheriff's deputy David Zajicek and Traci Mattice, a probation and parole liaison, made additional, unsuccessful attempts to persuade plaintiff to cooperate.

When the cell entry team arrived at plaintiff's cell, defendant Brogan told plaintiff that the team would handcuff him and that if he resisted, Brogan would use the taser. To demonstrate, Brogan turned on the taser, showed it to plaintiff and "arced" it within

5

plaintiff's view.  Defendant Brogan then told plaintiff several times to lie face down on his bunk.  Plaintiff continued to refuse.  The door to the cell was opened and Brogan pointed the taser at plaintiff without shooting it, told plaintiff several times to lie face down on his bunk with his feet up on the bunk.

Plaintiff refused to comply with defendant Brogan's instructions.  Accordingly, the team moved into the cell.  Plaintiff continued to resist and defendant Cline struck him in the face area with a closed fist.  Plaintiff said, "You just punched me in the nose, bitch" and "I'm suing," but he ceased resisting.

Defendants Cline and Krause-Hengst held plaintiff on his stomach while defendant Peterson secured plaintiff's hands behind his back and applied handcuffs.  After defendant McPherson applied leg shackles, the team moved plaintiff to a prisoner restraint chair for transfer.

Plaintiff had a small cut to his lip.  It is red in the video but does not appear to be bleeding.  Defendant Cline asked him whether he was hurt, but he refused to respond. Defendants wheeled him to the jail nurse, who offered him medical assistance and wiped his lip.  Plaintiff refused to respond when defendant Krause-Hengst asked him several times whether he would let the nurse treat him, despite defendant Brogan's telling him that failure to answer is a refusal.

Plaintiff was moved into the sub-basement of the jail and secured in a transport van

6

without incident.  At no time during the transfer process did defendant Brogan or any other deputies notice any evidence that plaintiff had defecated in his pants.  Had that happened, their practice would have been to have him cleaned up before moving him.

Deputy Harris was one of the deputies that transferred plaintiff to Sturtevant.  He escorted plaintiff into the holding area there.  An inmate at Sturtevant said to Harris, "Dep, watch your step.  He just shit on the floor."  Deputy Harris saw plaintiff shaking his pant leg and observed what appeared to be feces on the floor in different areas along the path the two had taken from the vehicle to the holding area.  Deputy Harris did not observe anything on the floor of the Sturtevant holding area when he first entered the area, but observed feces in plaintiff's path thereafter.  The defecation incident was brought to the attention of Sturtevant staff when plaintiff was turned over to their custody.

Deputy Harris donned protective gloves and searched the seat of the vehicle where plaintiff had been during the transport, as well as the surrounding floor.  He saw nothing consistent with the sight or smell of the feces he had observed on the floor in Sturtevant.

When inmates are first detained at the Dane County jail, they are given a copy of the jail handbook.  Plaintiff received such a handbook.  The handbook sets forth a formal grievance procedure inmates must follow to report concerns about events occurring in the jail.  Section VI. D. requires that the "Security Services secretary must receive the grievance form within ten (10) days from the date the issue occurred."  Section VI. F. provides that

"grievances may be sent through the U.S. Mail" and provides addresses.

The Jail Security Services secretary did not receive a grievance form from plaintiff concerning the events of March 6, 2009.

Plaintiff did not have a copy of the Inmate Handbook or a grievance form when he left the Dane County jail.

OPINION

The initial question is whether plaintiff can proceed on his claims or whether he is barred from doing so because he did not exhaust his administrative remedies at the jail. Defendants say he cannot because the Jail Security Services secretary never received a grievance form from him; plaintiff says he never had a chance to do so because he was removed immediately after the incident.  Once removed, he had no access to the jail handbook or to the grievance forms he would have needed, although he asked for them at Sturtevant.

The proposed facts do not make it clear whether the jail's grievance system requires grievants to use a grievance form.  It may be that plaintiff could have submitted his complaint about his handling in the transfer process on plain paper, but defendants do not say so.  If plain paper was acceptable, it is likely that plaintiff would have had access to paper at Sturtevant and could have mailed his grievance to the jail within ten days, as the process

8

required.

It is defendants' burden to prove that plaintiff had a fair opportunity to exhaust his administrative remedies on the claims he is bringing in this suit.  Plaintiff alleged that he asked for a grievance form at Sturtevant and was told that the facility did not have such a form.  Defendants have not shown that the form was unnecessary to the filing and that plain paper would have sufficed.  Therefore, I cannot conclude that plaintiff had a fair opportunity to exhaust his administrative remedies.  If the employees at Sturtevant could not provide a former Dane County jail inmate with the necessary form, when requested, it is difficult to understand how plaintiff had any available remedies.  It is improbable that he could have written the jail, asked for a grievance form, received one and mailed it back to the jail within the 10 days allotted for filing a grievance.

Correctional employees cannot exploit the exhaustion requirement by making it difficult or impossible to file a grievance.  Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (holding that district court erred in failing to consider prisoner's claim that he was unable to submit a grievance, and therefore lacked available administrative remedies, because prison employees refused to provide him with the necessary forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)." (alteration in original)).  The failure to exhaust is an affirmative defense that defendants have the burden of pleading and

9

proving; if defendants do not explain how plaintiff could use the administrative grievance system without the forms mandated for that purpose, they cannot claim the benefit of the defense.  Dale v. Lappin, 376 F.3d 652, 655-56 (7th Cir. 2004).  In the absence of any explanation of how plaintiff could use the administrative grievance system without the required forms, defendants have failed to show that plaintiff's failure to use the system prevents him from proceeding in this case.

I turn then to the merits of plaintiff's claims that he was subjected to excessive force and denied medical attention.  Both claims fail because plaintiff has offered no evidence to support them.  He alleged in his complaint that defendant Brogan pointed a taser at him during the cell entry and ordered the other defendants to jump on plaintiff, grab him and pull at him and that defendant Cline attacked him and punched him in the face, busting it open, *after* he was lying on his stomach with his arms pinned beneath his stomach.  Now at summary judgment, he has produced nothing to support these claims.  He says merely that he disputes defendant's proposed fact and that he "never resisted, Deputy Cline just started attacking me, striking me in the head and face, busting my face open." Plt.'s Response, dkt. #43, at 4.

The video shows that plaintiff was resisting defendant Brogan's orders to lie face down on his bed with his feet on the bed and it refutes completely his allegations that Brogan directed the other defendants to jump on him, grab him or pull him.  It does not

10

show the blow to his face because of the number of people in the cell, blocking the video camera, but nothing in the demeanor or actions of the visible team members suggests that they have any purpose other than to transfer plaintiff carefully with as little confrontation and force as possible.  Their movements are measured and deliberate, as different as possible from the "jumping, pulling and grabbing" that plaintiff alleged.

Plaintiff's face is visible in the video shortly after he was hit.  It is not "busted open"; it does not show signs of multiple beatings.  It does show a small cut on his lower lip, supporting defendants' admission that defendant Cline delivered a closed blow to his face to overcome his continued resistance.  Unpleasant as such a blow would have been, it achieved the purpose of bringing plaintiff into compliance before harsher methods had to be employed, such as the taser.  Plaintiff has not shown that the force used against him was excessive in light of his obdurate resistance to cooperating with his transfer, the one blow that was applied, the minor nature of the resulting injury and the many efforts that the team made to persuade him to cease resisting.  In short, he has produced no evidence that the blow to his face was administered maliciously and sadistically for the very purpose of causing harm.  <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986).

In his complaint, plaintiff alleged that he was denied any form of medical treatment after he was extracted from his cell, although he was "bleeding in and out of consciousness with excrement running down his leg."   He disputes defendants' proposed facts that the

nurse offered to treat him and that defendant Krause-Hengst asked him several times whether he would let the nurse treat him, but he has cited nothing in the record to support his disputes.  This is not surprising in light of the video, which shows the nurse asking him repeatedly whether he wanted any treatment and his refusal to answer, despite defendant Brogan's reminder to him that a refusal to answer is taken as a refusal of treatment.  The video does not show that he was bleeding, that he was in and out of consciousness or that excrement was running down his leg.  (As to the latter allegations, plaintiff does not repeat in response to defendants' proposed facts that he had excrement running down his leg while he was still in the Dane County jail and he does not dispute defendants' proposed fact that the excrement was first observed after plaintiff arrived at the holding area at the Sturtevant facility.)

        To state an Eighth Amendment medical care claim, a prisoner must allege facts from which it can be inferred that he had a "serious medical need" and that prison officials were "deliberately indifferent" to this need.  Estelle v. Gamble, 429 U.S. 97, 103 (1976); Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997).  A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering when treatment is withheld, Gutierrez, 111 F.3d at 1371-73 (7th Cir. 1997), "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th

Cir. 1996) or otherwise subjects the prisoner to a substantial risk of serious harm, <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).  "Deliberate indifference" means that the officials were aware that the prisoner needed medical treatment, but disregarded the risk by failing to take reasonable measures.  <u>Forbes v. Edgar</u>, 112 F.3d 262, 266 (7th Cir. 1997).

Plaintiff has failed to show that he could prove at trial either of the required elements of an Eighth Amendment claim for denial of a serious medical need.  He has not shown either that he had a serious medical need or that the jail officials were indifferent to his need.  To the contrary, he had a minor cut to his lip and he rebuffed the jail's efforts to give him medical assistance for the cut or for any other problem he might be experiencing as a result of the cell extraction.  I conclude that no reasonable jury could find for plaintiff on either of his Eighth Amendment claims, excessive force or denial of treatment for a serious medical need.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Lisa Krause-Hengst, Travis McPherson, Jaime Peterson, David Cline, Cindy Schaller, Colin Foster and John Brogan is GRANTED.  The clerk of court is directed to enter judgment for

13

defendants and close this case.

Entered this 15th day of March, 2010.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge